**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY, an Ohio Corporation, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 06-C-4554 |
| | ) |
| BALLY TOTAL FITNESS HOLDING CORPORATION, | ) Judge Wayne P. Anderson |
| | ) Magistrate Judge Martin C. Ashman |
| Defendant and Third-Party Plaintiff, | ) |
| v. | ) |
| RLI INSURANCE COMPANY; TRAVELERS INDEMNITY COMPANY (as successor-in-interest by merger to Gulf Insurance Company); FIREMAN'S FUND INSURANCE COMPANY; and ACE AMERICAN INSURANCE COMPANY, | ) |
| Third-Party Defendants. | ) |
| ACE AMERICAN INSURANCE COMPANY, | ) |
| Third-Party Defendant and Counterclaimant, | ) |
| v. | ) |
| GEORGE N. ARONOFF; PAUL TOBACK; JOHN H. DWYER; LEE S. HILLMAN; STEPHEN C. SWID; JAMES McANALLY; J. KENNETH LOOLOIAN; LIZA M. WALSH; ANNIE P. LEWIS, as Executor of the Estate of AUBREY C. LEWIS, Deceased; THEODORE NONCEK; GEOFF SCHEITLIN; JOHN H. WILDMAN; JOHN W. ROGERS, JR.; and MARTIN E. FRANKLIN, | ) |
| Additional Defendants on Counterclaim. | ) |

**ANSWER AND COUNTERCLAIM OF THIRD-PARTY
DEFENDANT AND COUNTERCLAIMANT
<u>ACE AMERICAN INSURANCE COMPANY</u>**

Third-party defendant and counterclaimant ACE American Insurance Company
(ôACEö), by its attorneys, for its answer to the third-party complaint of Bally Total Fitness
Holding Corporation (ôBallyö) and its counterclaim against Bally and additional defendants
George N. Aronoff, Paul Toback, John H. Dwyer, Lee S. Hillman, Stephen C. Swid, James
McAnally, J. Kenneth Looloian, Liza M. Walsh, Annie P. Lewis (as Executor of the Estate of
Aubrey C. Lewis, Deceased), Theodore Noncek, Geoff Scheitlin, John H. Wildman, John W.
Rogers, Jr., and Martin E. Franklin (collectively, the ôIndividual Insuredsö), alleges as follows:

## Nature of the Action

1.      This third-party complaint arises from the Excess Insurers' attempt to
avoid the contractual obligations they owe to Bally.  The Excess Insurers sold insurance policies
to Bally for hundreds of thousands of dollars of premiums, but when Bally was exposed to the
very sort of claims those policies expressly covered, the Excess insurers claimed that the policies
were void *ab initio* to subject to rescission.  Bally seeks a declaratory judgment that the policies
are valid, legal and binding obligations of the Excess Insurers.

**ANSWER:**     Denies the allegations in paragraph 1 of the third-party complaint, except admits

that each of the Excess Insurers, including ACE, issued an insurance policy to

Bally in return for an agreed premium; that ACE and, to the best of ACEøs

knowledge, the other Excess Insurers have claimed that the policies they issued to

Bally are void *ab initio* or subject to rescission; and that Bally now purports to

seek a declaration that such policies are valid, legal and binding contracts.


2.      In addition, Third-Party Defendant RLI has wrongfully failed to pay
millions of dollars in covered loss during a period of financial hardship to Bally.  RLI has
improperly asserted numerous inapplicable policy exclusions and limitations, and has forced
Bally to respond to a series of shifting and expanding information requests.  At the same time,
RLI has sought to forestall Bally from suing to recover the money it is owed by delivering empty
assurances that RLI would honor its contractual obligations.  RLI is currently in breach of its
obligations to the tune of over $5,000,000, and that amount continues to increase.  Accordingly,
Bally seeks a declaration that RLI is obligated immediately to fund all amounts that Bally has
tendered under the RLI policy, and that RLI must fund amounts that Bally tenders in the future
until the full policy limit has been exhausted.

**ANSWER:**    Denies the allegations in paragraph 2 of the third-party complaint, except denies

knowledge or information sufficient to form a belief as to the coverage positions

taken by RLI Insurance Company (õRLIö) with respect to claims tendered to it by

Bally or as to the amount of money that RLI has been asked to fund under its

policy, and admits that Bally now purports to seek a declaration that RLI is

required to fund amounts tendered to it by Bally.

### The Parties

3.    Bally is a Delaware corporation with its principal place of business in Chicago, Illinois.  Bally is one of the largest commercial operators of fitness centers in the United States.

**ANSWER:**    Upon information and belief, admits the allegations in paragraph 3 of the third-

party complaint.

4.    RLI is an Illinois corporation with its principal place of business in Peoria, Illinois.  RLI issued to Bally a first layer of excess directors' and officers' liability insurance for the period June 30, 2002 to June 30, 2003.

**ANSWER:**    Upon information and belief, admits the allegations in paragraph 4 of the third-

party complaint.

5.    Travelers is a Connecticut corporation with its principal place of business in Hartford, Connecticut, and is the successor-in-interest to Gulf as the result of a merger.  Gulf issued to Bally a second layer of excess directors' and officers' liability insurance for the period June 30, 2002 to June 30, 2003.

**ANSWER:**    Upon information and belief, admits the allegations in paragraph 5 of the third-

party complaint.

6.    ACE is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.  ACE issued to Bally a third layer of excess directors' and officers' liability insurance for the period June 30, 2002 to June 30, 2003.

- 3 -

**ANSWER:**     Admits the allegations in paragraph 6 of the third-party complaint.


7.     Fireman's Fund is a California corporation with its principal place of business in Novato, California.  Fireman's Fund issued to Bally a fourth layer of excess directors' and officers' liability insurance for the period from June 30, 2002 to June 30, 2003.

**ANSWER:**     Upon information and belief, admits the allegations in paragraph 7 of the third-

party complaint.


### Jurisdiction and Venue


8.     This Court has supplemental jurisdiction over the subject matter of this Third-Party Complaint, including Bally's claims against RLI, pursuant to 28 U.S.C. § 1367(a). The claims in this Third-Party Complaint are so related to and intertwined with the claims at issue in the remainder of the case, over which the court has original jurisdiction under 28 U.S.C. § 1332, that they form part of the same case or controversy under Article III of the United States Constitution.

**ANSWER:**     Paragraph 8 of the third-party complaint alleges only legal conclusions to which

no response is required.


9.     This Court also has subject matter jurisdiction over Bally's third-party claims against Travelers, ACE, and Fireman's Fund pursuant to 28 U.S.C. § 1332.  Bally, on the one hand, and Travelers, ACE, and Fireman's Fund, on the other, are citizens of different States, and the amount in controversy exceeds $75,000.

**ANSWER:**     As to the allegations in paragraph 9 of the third-party complaint, admits that

Bally, Travelers Indemnity Company (ôTravelersö), ACE and Firemanøs Fund

Insurance Company (ôFiremanøs Fundö) are citizens of different states and that

the amount in controversy exceeds $75,000, but states that the remainder of the

paragraph alleges only legal conclusions to which no response is required.


10.     Venue is proper under 28 U.S.C. § 1391(2) and (3).  A substantial part of the events giving rise to Bally's third party claims against the Excess Insurers occurred in the Northern District of Illinois.  In addition, the Excess Insurers do substantial business in the state of Illinois and are subject to personal jurisdiction in the Northern District of Illinois.

- 4 -

**ANSWER:**     As to the allegations in paragraph 10 of the third-party complaint, admits that

certain of the events giving rise to Bally's third-party claims occurred in the

Northern District of Illinois and that ACE does business in the State of Illinois;

denies knowledge or information sufficient to form a belief as to whether RLI,

Travelers and Fireman's Fund do business in Illinois; and states that the

remainder of the paragraph contains only legal conclusions to which no response

is required.

## Factual Allegations

### The 02/03 Excess Policies

11.     RLI issued to Bally a first-layer excess directors' and officers' liability insurance policy effective for the period June 30, 2002 to June 30, 2003 (the "02/03 RLI Policy").  The 02/03 RLI Policy has an aggregate limit of $10,000,000, excess of $10,000,000 in underlying insurance provided by GAIC (the "02/03 GAIC Primary Policy").  True and correct copies of the 02/03 GAIC Primary Policy and the 02/03 RLI Policy are attached as Exhibits A and B, respectively.   The 02/03 RLI Policy provides that its coverage shall apply "in conformance with the terms and conditions of the Primary Policy."  (02/03 RLI Policy ¶ 1). "Primary Policy" refers to the 02/03 GAIC Primary Policy, Policy Number DOL5741464, which was also effective for the period June 30, 2002 through June 30, 2003, (02/03 RLI Policy, Declarations Item 4(A)).

**ANSWER:**     As to the allegations in paragraph 11 of the third-party complaint, admits that RLI

issued to Bally a policy bearing the number EPG0001569 (the "02/03 RLI

Policy"), and otherwise respectfully refers to the 02/03 RLI Policy itself for the

terms and conditions thereof.

12.     Gulf issued to Bally a second-layer excess directors' and officers' liability insurance policy effective for the period June 30, 2002 to June 30, 2003 (the "02/03 Gulf Policy").   The 02/03 Gulf Policy has an aggregate limit of $10,000,000, excess of the $20,000,000 in underlying insurance provided by GAIC and RLI.  A true and correct copy of the 02/03 Gulf Policy is attached as Exhibit C.  The 02/03 Gulf Policy provides that its coverage shall apply "pursuant to the Insuring Clause(s) set forth in the Underlying Insurance, subject to:

- 5 -

A. the terms and conditions of the Underlying Insurance as in effect on the Policy Inception Date; í ö (02/03 Gulf Policy § 1). õUnderlying Insuranceö is defined as the 02/03 GAIC Primary Policy and the 02/03 RLI Policy. (02/03 Gulf Policy § II.A.5; Declarations Item 4).

**ANSWER:**   As to the allegations in paragraph 12 of the third-party complaint, admits that

Gulf Insurance Company (õGulfö) issued to Bally a policy bearing the number

GA0350519 (the õ02/03 Gulf Policyö), and otherwise respectfully refers to the

02/03 Gulf Policy itself for the terms and conditions thereof.


13.   ACE issued to Bally a third-layer excess directorsø and officersø liability insurance policy effective for the period June 30, 2002 to June 30, 2003 (the õ02/03 ACE Policyö). The 02/03 ACE Policy has an aggregate limit of $10,000,000 excess of $30,000,000 in underlying insurance provided by GAID, RLI and Gulf. A true and correct copy of the 02/03 ACE Policy is attached at Exhibit D. The 02/03 ACE policy provides that its coverage shall apply õin accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy, except as otherwise provided herein.ö (02/03 ACE Policy § 1). The 02/03 ACE Policy defines the term õFollowed Policyö as the 02/03 GAIC Primary Policy. (02/03 ACE Policy, Declarations Item 3).

**ANSWER:**   As to the allegations in paragraph 13 of the third-party complaint, admits that

ACE issued to Bally a policy bearing the number DOX G21635856 001 (the

õ02/03 ACE Policyö), and otherwise respectfully refers to the 02/03 ACE Policy

itself for the terms and conditions thereof.


14.   Firemanøs Fund issued to Bally a fourth-layer excess directorsø and officersø liability insurance policy effective for the period June 30, 2002 to June 30, 2003 (the õ02/03Firemanøs Fund Policyö). The 02/03 Firemanøs Fund Policy has an aggregate limit of $10,000,000 excess $40,000,000 in underlying insurance provided by GAIC, RLI, Gulf and ACE. A true and correct copy of the 02/03 Firemanøs Fund Policy is attached as Exhibit E. The 02/03 Firemanøs Fund policy provides that its coverage shall apply õin conformance with the definitions, term, conditions, limitations, warranties and exclusions of the Primary Policy, except as otherwise provided in the definition, terms, conditions, limitations, warranties and exclusions in this Policy.ö (02/03 Firemanøs Fund Policy § 1). The 02/03 Firemanøs Fund Policy defines the term õPrimary Policyö as the 02/03 GAIC Primary Policy. (02/03 Firemanøs Fund Policy § III.D.; Declarations).

**ANSWER:**   As to the allegations in paragraph 14 of the third-party complaint, admits that

Firemanøs Fund issued to Bally a policy numbered CXD-000-9692-9104 (the

- 6 -

"02/03 Fireman's Fund Policy"), and otherwise respectfully refers to the 02/03 Fireman's Fund Policy for the terms and conditions thereof.

15.     The 02/03 RLI Policy, the 02/03 Gulf Policy, the 02/03 ACE Policy, and the 02/03 Fireman's fund Policy are collectively referred to herein as the "02/03 Excess Policies."

**ANSWER:**     As to the allegations in paragraph 15 of the third-party complaint, does not object

to characterizing the 02/03 RLI Policy, the 02/03 Gulf Policy, the 02/03 ACE

Policy, and the 02/03 Fireman's Fund Policy collectively as the "02/03 Excess

Policies."

16.     Bally bought the 02/03 GAIC Primary Policy and the 02/03 Excess Policies to obtain valuable protection for the company and its directors and officers in the event that they were named in claims alleging violations of federal or state securities laws.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 16 of the third-party complaint.

17.     The Insuring Agreement of the 02/03 GAIC Primary Policy, which is applicable to each of the 02/03 Excess Policies, reflects this bargained-for coverage.  In the first paragraph of the Insuring Agreement, GAIC expressly agreed to cover Bally's officers and directors for securities claims:  "The Insurer shall pay on behalf of the Insured Persons all Loss which the Insured Person shall be legally obligated to pay as a result of a Claim (including an Employment Practices Claim *or a Securities Claim*) first made against the Insured Persons during the Policy Period or the Discovery Period for a Wrongful Act,. . ."  (Ex. A § 1.A., emphasis added).

**ANSWER:**     Denies the allegations in paragraph 17 of the third-party complaint, and

respectfully refers to the 02/03 GAIC Primary Policy in its entirety for the terms

and conditions thereof.

18.     The Insuring Agreement goes on to extend the same critical protection to claims against Bally itself:  "The Insurer shall pay on behalf of the Insured Entity all Loss which the Insured Entity shall be legally obligated to pay *as a result of a Securities Claim* first made

- 7 -

against the Insured Entity during the Policy Period or the Discovery Period for a Wrongful Act."
(*Id.* § 1.C., emphasis added).

**ANSWER:** Denies the allegations in paragraph 18 of the third-party complaint, and respectfully refers to the 02/03 GAIC Primary Policy in its entirety for the terms and conditions thereof.

19. "Securities Claim" is defined in the 02/03 GAIC Primary Policy, and therefore in the 02/03 Excess Policies, to include any claims related to the sale or purchase of Bally's securities, or any claims brought by any of Bally's securities holders with regard to their interests:

> "Securities Claim" shall mean any Claim (including a civil lawsuit or criminal proceeding brought by the Securities and Exchange Commission) made against an Insured alleging a violation of any law, regulation or rule, whether statutory or common law, which is:
>
> (1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the: (a) purchase or sale of, or (b) offer or solicitation of any offer to purchase or sell, any securities of the Company, or
>
> (2) brought by a security holder of the Company, arising solely with respect to such security holder's interest in such securities of the Company, whether directly, by class action, or derivatively on behalf of the Company.

(*Id.* § III.P).

**ANSWER:** As to the allegations in paragraph 19 of the third-party complaint, respectfully refers to the 02/03 GAIC Primary Policy in its entirety for the terms and conditions thereof.

20. The term "Claim" is defined broadly to include any "written demand for monetary or non-monetary relief made against any Insured and reported to the Insurer" or "a civil, criminal, administrative or arbitration proceeding made against any Insured seeking monetary or non-monetary relief and commenced by the service of a complaint or similar pleading, the return of an indictment, or the receipt or filing of notice of charges or similar document, including any proceeding initiated against any Insured before the Equal Employment Opportunity Commission or any similar governmental body." (*Id.*, § III.A.(1) & (2)).

- 8 -

**ANSWER:**   As to the allegations in paragraph 20 of the third-party complaint, respectfully refers to the 02/03 GAIC Primary Policy in its entirety for the terms and conditions thereof.

21.   The policy defines "Loss" to include damages, settlements, and defense costs: "'Loss' shall mean compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, settlements and Costs of Defense. . . ." (*Id.*, § III.L.).

**ANSWER:**   As to the allegations in paragraph 21 of the third-party complaint, respectfully refers to the 02/03 GAIC Primary Policy in its entirety for the terms and conditions thereof.

22.   "Costs of Defense" are defined as "reasonable and necessary legal fees, costs and expenses incurred in the Investigation, defense or appeal of any Claim ..." (*Id.*, § III.D.).

**ANSWER:**   As to the allegations in paragraph 22 of the third-party complaint, respectfully refers to the 02/03 GAIC Primary Policy in its entirety for the terms and conditions thereof..

**The 2002 Proposal Form**

23.   In connection with obtaining the 02/03 GAIC Primary Policy, Bally submitted a Publicly Traded Corporation Renewal Proposal Form (the "2002 Proposal Form") to GAIC.  A true and correct copy of the 2002 Proposal Form is attached hereto as Exhibit F.

**ANSWER:**   Upon information and belief, admits the allegations in paragraph 23 of the third-party complaint.

24.   The 2002 Proposal Form is a form prepared by GAIC, on GAIC's corporate letterhead.

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the third-party complaint.

- 9 -

25.     In its Proposal Form, GAIC included a pre-printed statement that certain documents, including past financial statements and SEC filings of the applicant company, were *actually* õattached to and made part of the Proposal Form.ö  The 2002 Proposal Form includes this boilerplate recitation.

**ANSWER:**     Denies the allegations in paragraph 25 of the third-party complaint, and

respectfully refers to the 2002 Proposal Form itself for the true contents thereof.

26.     The completed 2002 Proposal Form has no financial statements or SEC filings attached.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 26 of the third-party complaint.

27.     Upon information and belief, none of the Excess Insurers relied on the Bally financial statements and SEC filing described in the Proposal Form as attached thereto in agreeing to issue their policies.

**ANSWER:**     Denies the allegations in paragraph 27 of the third-party complaint.

28.     Upon information and belief, the Bally financial statements and SEC filings described in the Proposal Form as attached thereto did not materially affect any of the Excess Insurersø decision to issue any of the 02/03 Excess Policies, nor did those documents materially affect the hazard assumed by the Excess Insurers in issuing in those policies.

**ANSWER:**     Denies the allegations in paragraph 28 of the third-party complaint.

29.     The 2002 Proposal Form provides increased protection, over and above the minimum standards established by Illinois statue, against rescission of the Policies.  For example, GAIC included a õBest Knowledge Clauseö in the 2002 Proposal Form stating that:

> The undersigned Officer of the Company declares that to the best of his or her knowledge the statements set forth herein are true and correct and that all reasonable efforts have been made to obtain sufficient information from each and every Director and Officer proposed for this insurance to facilitate the proper and accurate completion of this Proposal Form.

**ANSWER:**     Denies the allegations in paragraph 29 of the third-party complaint, except admits

that the paragraph accurately quotes one sentence of the 2002 Proposal Form, and

respectfully refers to the entire document for its complete contents.

- 10 -

30.     GAIC also included a "Severability Clause" in the 2002 Proposal Form providing that:

> any misstatement or omission in this Proposal Form or information provided herewith in respect of a specific Wrongful Act by a particular Director or Officer or his or her cognizance of any matter which he or she has reason to believe might afford grounds for a future Claim against him or her shall not be imputed to any other Director or Officer for purposes of determining the validity of this Policy as to such other Director or Officer.

**ANSWER:**     As to the allegations in paragraph 30 of the third-party complaint, admits that the

paragraph accurately quotes certain selected language from the 2002 Proposal

Form and respectfully refers to the entire document for its complete contents.

31.     Neither the 2002 Proposal Form nor any information provided with the 2002 Proposal Form includes any misstatement or omission sufficient to void the Policies pursuant to the Knowledge and Belief Clause and the Severability Clause GAIC drafted.

**ANSWER:**     Denies the allegations in paragraph 31 of the third-party complaint.

**The Underlying Claim**

32.     Bally and its directors and officers have been the target of several claims of exactly the type that the Excess Insurers drafted, marketed and sold the 02/03 Excess Policies to cover.

**ANSWER:**     Denies the allegations in paragraph 32 of the third-party complaint, except admits

that lawsuits have been filed against Bally and some or all of the Individual

Insureds.

33.     Bally and certain of its directors and officers were named as defendants, or have become the subject of governmental investigations, in proceedings that include but are not limited to the following (collectively, the "Underlying Claims"):

(i)     *In re Bally Total Fitness Sec. Litig.,* No. 04 C 3530 (N.D. Ill. 2004);

(ii)     *Levine v. Bally Total Fitness Holding Corp., et al.*, No. 06 C 1437 (N.D. Ill. 2006);

- 11 -

(iii)  *Berra, et al. v. Toback, et al.*, NO. 04 CH 09132 (Cook Co. Cir. Ct. 2004);

(iv)  *Schachter, et al. v Toback, et al.*, No. 04 CH 09131 (Cook Co. Cir. Ct. 2004);

(v)  *Said, et al. v. Toback, et al.*, No. 05 C 1981 (N.D. Ill. 2005);

(vi)  *Garrison, et al. v. Bally Total Fitness Holding Corp., et al.,* CV 04 1331 (D. Ore. 2004);

(vii)  *Fit Tech Inc., et al. v. Bally Total Fitness Holding Corp.,* Nos. 03-CV-10295 (D. Mass. 2003) and 05-CV-10471 MEL (D. Mass. 2005);

(viii)  *Butcher v. Bally Total Fitness Corp., et al.*, Case No. CV 02 458434 (Ct. of Comm. Pleas of Cuyahoga Co. Ohio 2002) and related arbitration;

(ix)  an investigation by the Securities and Exchange Commission, in which the SEC issued a formal Order Directing Private Investigation and Designating Officers to Take to Take Testimony on May 27, 2004;

(x)  an investigation by the United States Attorney for the District of Columbia; and

(xi)  a demand made by certain shareholders upon Bally to bring actions or seek remedies against other parties alleged to be responsible for accounting errors in connection with Bally∂s financial statements.

(xii)  *Levine v. Bally Total Fitness Holding Corp., et al.,* Case No. 2007 L 004280 (Cook Co. Cir. Ct. 2007).

**ANSWER:**  Upon information and belief, admits the allegations in paragraph 33 of the third-party complaint.

34.  Each of the Underlying Claims constitutes a ∂Securities Claim∂ or a ∂Claim∂ as those terms are defined in the 02/03 GAIC Primary Policy and the 02/03 Excess Policies.

**ANSWER:**  Paragraph 34 of the third-party complaint alleges only a legal conclusion to which no response is required.

- 12 -

35. Bally has defended each of the Underlying Claims, successfully obtaining the dismissal of several of those actions. None of the Underlying Claims has resulted in a judicial finding of any wrongdoing on Bally's part.

**ANSWER:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 of the third-party complaint, except admits, upon information and belief, that Bally has defended at least certain of the matters characterized as the "Underlying Claims" and that at least some of those matters have been dismissed or otherwise resolved.

36. Bally has incurred substantial expenses in connection with the Underlying Claims, and will continue to do so until all of the claims are resolved. The expenses Bally incurred to defend, investigate, and settle the Underlying Claims are "Costs of Defense" and "Loss," as those terms are defined in the 02/03 GAIC Primary Policy and the 02/03 Excess Policies.

**ANSWER:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 36 of the third-party complaint, and states that the remainder of the paragraph alleges only a legal conclusion to which no response is required.

**Instead Of Honoring Their Contractual Obligations, The Excess Insurers Purport To Rescind the Policies And Sue Bally**

37. Faced with the Underlying Claim, Bally turned to its insurers for coverage. Bally notified GAIC and the Excess Insurers of the facts and circumstances that gave rise to the Underlying Claims on June 26, 2003, and has given GAIC and the Excess Insurers notice of other individual Underlying Claims in due course.

**ANSWER:** Denies the allegations in paragraph 37 of the third-party complaint, except admits that ACE has been notified of some or all of the matters characterized as the "Underlying Claims."

38. On July 14 2005, RLI sent Bally a letter in which RLI claimed that it had received and relied upon the 20002 Proposal Form and Bally's financial statements in issuing the

02/03 RLI Policy, and asserted that the 02/03 RLI Policy was therefore void *ab initio* or subject to rescission.

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 38 of the third-party complaint.

39.   On November 9, 2005, Travelers sent Bally a letter purporting to rescind the 02/03 Gulf Policy.  On the same date, ACE sent Bally a letter purporting to rescind the 02/03 ACE Policy.

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 39 of the third-party complaint, except admits that, on or

about November 9, 2005, ACE sent Bally a letter rescinding the 02/03 ACE

Policy.

40.   A day after Travelers and ACE sent letters to Bally purporting to unilaterally rescind their policies, those insurers jointly filed suit in the Northern District of Illinois seeking, among other things, a declaration that their policies were void *ab initio* or voidable and of no force and effect.  That lawsuit was captioned *Travelers Indemnity Co., et al. v. Bally Total Fitness Holding Corp., et al.,* No. 05 C 6441 (N.D. Ill. 2005).

**ANSWER:**   Admits the allegations in paragraph 40 of the third-party complaint.

41.   On December 16, 2005, Fireman's Fund intervened in the *Travelers* lawsuit, seeking the same relief with respect to the 02/03 Fireman's Fund Policy.

**ANSWER:**   Admits the allegations in paragraph 41 of the third-party complaint.

42.   On April 6, 2006, RLI filed a one-count complaint in Illinois state court seeking to rescind the 02/03 RLI Policy.  That lawsuit was captioned *RLI Insurance Co. v. Bally Total Fitness Holding Corp., et al.,* No. 06 CH 06892 (Cook Co. Cir. Ct. 2006).

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 42 of the third-party complaint.

43.   If the Excess Insurers were permitted to rescind policies specifically drafted to cover securities claims based on alleged misrepresentations at issue in the Underlying

Claims, then the insurance coverage the Excess Insurers sold to Bally for hundreds of thousands of dollars was illusory.

**ANSWER:**     Denies the allegations in paragraph 43 of the third-party complaint.


44.     Bally moved to stay or dismiss without prejudice each of the Excess Insurersø complaints due to the substantial overlap of between the Underlying Claims and the Excess Insurersø declaratory judgment actions. Ballyøs motion to dismiss the *Travelers* lawsuit was granted on September 11, 2006. Ballyøs motion to dismiss the *RLI* lawsuit was granted on November 16, 2006.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 44 of the third-party complaint, except admits that Bally

moved to stay or, in the alternative, to dismiss without prejudice the *Travelers* suit

and that Ballyøs motion was granted in part and denied in part.


## RLI Refuses to Advance Millions Of Dollars Of Covered Loss Under Its Policy


45.     After providing RLI with its initial notice letter in June of 2003, Bally invited RLI to participate in its defense of the Underlying Claims. During the defense of those cases RLI was invited to participate, and did participate, in multiple conference calls with Ballyøs defense counsel regarding the factual and legal bases for the claims.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 45 of the third-party complaint.


46.     In April 2006, Bally invited RLI (and its other insurers) to participate in a mediation session with plaintiffs in one of the largest of the Underlying Claims. RLI sent a senior member of its management and its outside counsel to attend the mediation, but ó unbeknownst to Bally or any of the other participants ó as RLI representatives were sitting in the mediation, RLI was filing a lawsuit against Bally in Illinois state court seeking to rescind the 02/03 RLI Policy. RLI did not disclose that it had filed the lawsuit until *after* the mediation session concluded.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 46 of the third-party complaint, except admits that ACE

was invited to attend, and did attend, a mediation session in April 2006, and that

representatives of RLI also attended that session.

47. Despite RLI¢s decision to sue at the very moment its representatives were sitting in a conference room with Bally¢s representatives to ostensibly participate in efforts to settle an Underlying Claim, Bally continued to make information regarding the defense of the Underlying Claims available to RLI through written presentations and analyses, copies of pleadings, and direct access to Bally¢s counsel.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 47 of the third-party complaint.

48. Notwithstanding Bally¢s efforts, RLI took the position that it had not received sufficient information to evaluate the merits of the Underlying Claim.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 48 of the third-party complaint.

49. On May 19, 2006, Bally advised RLI that the limit of the GAIC Primary Policy was nearing exhaustion, and that RLI would soon be responsible for funding Bally¢s ongoing defense. On June 14, 2006, RLI responded by questioning the payments GAIC had made and demanding additional information from Bally.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 49 of the third-party complaint.

50. In response, Bally forwarded RLI copies of all invoices it had submitted to GAIC, as well as documentation showing GAIC¢s reimbursements.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 50 of the third-party complaint.

51. On July 11, 2006, Bally informed RLI that it had submitted invoices to GAIC sufficient to exhaust the remaining portion of the GAIC policy limit.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 51 of the third-party complaint.

- 16 -

52.     On August 7, 2006, Bally provided written notice to RLI that the GAIC policy limit had been exhausted, and tendered to RLI invoices totaling over $1,100,000 for reimbursement as Costs of Defense.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 52 of the third-party complaint.


53.     Over the next seven months, Bally tendered to RLI additional invoices totaling over $4,000,000 for reimbursement as Costs of Defense.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 53 of the third-party complaint.


54.     On October 4, 2006, RLI sent Bally a letter asserting that the existence of its then-pending rescission lawsuit entitled RLI to withhold payment for Costs of Defense.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 54 of the third-party complaint.


55.     RLI's rescission lawsuit was dismissed on November 16, 2006.


**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 55 of the third-party complaint.


56.     On November 29, 2006, a senior RLI executive spoke directly with Bally's General Counsel via telephone regarding the millions of dollars of invoices that Bally had tendered.  The RLI executive stated that RLI understood its need to provide a defense to Bally, and told Bally's General Counsel not to file suit over RLI's nonpayment, because RLI would start funding Bally's Costs of Defense.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 56 of the third-party complaint.


57.     In the months following RLI's assurances, Bally continued to provide information to RLI concerning the Underlying Claims, continued to make its counsel available to RLI for discussions and to answer questions, and continued to supply documentation and answer questions regarding its Costs of Defense.

- 17 -

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 of the third-party complaint.

58.   Despite Bally's repeated requests, RLI has not paid a single dollar of Bally's Costs of Defense.

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 of the third-party complaint.

### COUNT I – Declaratory Judgment Regarding Validity of the 02/03 Excess Policies

59.   Bally realleges and incorporates by reference each of its allegations in paragraphs 1 through 58, inclusive.

**ANSWER:**   Responds to paragraph 59 of the third-party complaint as it has responded to the allegations incorporated by reference therein.

60.   Bally timely paid all premiums for the 02/03 Excess Policies.

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 of the third-party complaint, except admits that Bally timely paid the premium for the 02/03 ACE Policy.

61.   The Excess Insurers executed the 02/03 Excess Policies and issued each of those policies to Bally.

**ANSWER:**   Upon information and belief, admits the allegations in paragraph 61 of the third-party complaint.

62.   There is an actual case or controversy between Bally and the Excess Insurers with respect to the validity of each the 02/03 Excess Policies, based on the Excess Insurers' assertion that those policies are void *ab initio* or subject to rescission.

**ANSWER:**   Paragraph 62 of the third-party complaint alleges only a legal conclusion to which no response is required.

- 18 -

63.     Pursuant to 28 U.S.C. § 2201, Bally seeks a declaratory judgment that the 02/03 Excess Policies are valid, legal and binding obligations of each Excess Insurers who issued one of those policies and not void *ab initio* or subject to rescission.

**ANSWER:**     As to paragraph 63 of the third-party complaint, admits that Bally seeks a

declaratory judgment for the relief described but denies it is entitled to such a

judgment.


### COUNT II – Declaration Of Coverage Regarding the Underlying Claim Against Third-Party Defendant RLI

64.     Bally realleges and incorporates by reference each of its allegations in paragraphs 1 through 63, inclusive.

**ANSWER:**     Responds to paragraph 64 of the third-party complaint as it has responded to the

allegations incorporated by reference therein.


65.     Bally has satisfied its obligations under the 02/03 RLI Policy.


**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 65 of the third-party complaint.


66.     The policy limit of the 02/03 GAIC Primary Policy has been exhausted by the payment of covered Loss, and all other conditions precedent to trigger coverage under the 02/03 RLI Policy have been met.

**ANSWER:**     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 66 of the third-party complaint.


67.     The 02/03 GAIC Primary Policy, and by extension the 02/03 RLI Policy, obligates Bally's insurers to advance Costs of Defense for covered Claims:

The Insurer shall advance Costs of Defense prior to the final disposition of any Claim, provided such Claim is covered by this Policy.   Any advancement shall be on the condition that:

(1) the appropriate retention has been satisfied, provided, however, this condition shall not apply in the event of the Financial Insolvency of the Policy;

(2) any amounts advanced by the Insurer shall serve to reduce the Limit of Liability stated in Item 3 of the Declarations to the extent they are not in fact repaid;

(3) the Company and Insured Persons and the Insurer have agreed upon the portion of the Costs of Defense attributable to covered Claims against the Insureds; and

(4) in the event it is finally established that the Insurer has no liability under the Policy for such Claim, the Company and the Insured Persons will repay the Insurer upon demand all Costs of Defense advanced by virtue of this provision.

(Ex. A, § VII.E.).

**ANSWER:**   As to the allegations in paragraph 67 of the third-party complaint, admits that the

paragraph accurately quotes selected language from the 02/03 GAIC Primary

Policy but respectfully refers to the entire 02/03 GAIC Primary Policy for the

complete terms and conditions thereof.


68.    There are no unperformed conditions precedent to Bally's recovery under the 02/03 RLI Policy or to RLI's obligations to advance Costs of Defense. All such conditions precedent have been met. To the extent any such conditions precedent have not been met, they have been excused, waived, or RLI has not been prejudiced by their non-occurrence.

**ANSWER:**   Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 68 of the third-party complaint.


69.    Bally is entitled to coverage under the 02/03 RLI Policy for all amounts it has tendered to RLI with respect to the Underlying Claims.

**ANSWER:**   Upon information and belief, denies the allegations in paragraph 69 of the third-

party complaint.

70. RLI has not paid Bally any of the amounts tendered to RLI with respect to the Underlying Claims. Bally has tendered over $5,000,000 to RLI, a total that will continue to mount until the Underlying Claims are concluded.

**ANSWER:** Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 of the third-party complaint.

71. There is an actual case or controversy between Bally and RLI with respect to the existence of coverage under the 02/03 RLI Policy for the Underlying Claims, based on RLI's failure to reimburse Bally for any portion of the over $5,000,000 that Bally has tendered to RLI, and RLI's assertion that various policy provisions preclude or limit the scope of coverage for the amounts Bally has tendered.

**ANSWER:** Paragraph 71 of the third-party complaint alleges only a legal conclusion to which no response is required.

## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

As an affirmative defense to the claim asserted against it by Bally, and as a counterclaim against Bally and the Individual Insureds, ACE alleges:

### Parties

72. ACE is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

73. Bally is a Delaware corporation with its principal place of business in Chicago, Illinois.

74. Upon information and belief, counterclaim-defendant George N. Aronoff ("Aronoff") is a citizen of Ohio, and was a director of Bally from 2001 to 2003.

- 21 -

75.     Upon information and belief, counterclaim-defendant Paul Toback ("Toback") is a citizen of Illinois, was Chairman of Bally from 2003 to 2006, and served as President, Chief Executive Officer, and as a director of Bally from 2002 to 2006.

76.     Upon information and belief, counterclaim-defendant John H. Dwyer ("Dwyer") is a citizen of Illinois, was Executive Vice President and Chief Financial Officer of Bally between 1996 and 2004, and served as a director of Bally prior to and until 2004.

77.     Upon information and belief, counterclaim-defendant Lee S. Hillman ("Hillman") is a citizen of Illinois, was Chairman of Bally from 2000 to 2003, President and Chief Executive Officer of Bally from 1996 to 2003, and a director of Bally from 1992 to 2003.

78.     Upon information and belief, counterclaim-defendant Stephen C. Swid ("Swid") is a citizen of New York, and at times relevant hereto served as director of Bally.

79.     Upon information and belief, counterclaim-defendant James McAnally ("McAnally") is a citizen of New Jersey, and at times relevant hereto served as a director of Bally.

80.     Upon information and belief, counterclaim-defendant J. Kenneth Looloian ("Looloian") is a citizen of New Jersey, and at times relevant hereto served as a director of Bally.

81.     Upon information and belief, counterclaim-defendant Liza M. Walsh ("Walsh") is a citizen of New Jersey, and at times relevant hereto served as a director of Bally.

82. Upon information and belief, counterclaim-defendant Annie P. Lewis ("Lewis") is a citizen of New Jersey, and is the Executor of the Estate of Aubrey C. Lewis, deceased, who at times relevant hereto served as a director of Bally.

83. Upon information and belief, counterclaim-defendant Theodore Noncek ("Noncek") is a citizen of Illinois, and was Vice President and Controller of Bally from 2000 until February 2005.

84. Upon information and belief, counterclaim-defendant John H. Wildman ("Wildman") is a citizen of Illinois, and is currently an officer of Bally.

85. Upon information and belief, counterclaim-defendant John W. Rogers, Jr. ("Rogers") is a citizen of Illinois, and at times relevant hereto served as a director of Bally.

86. Upon information and belief, counterclaim-defendant Martin E. Franklin ("Franklin") is a citizen of New York, and at times relevant hereto served as a director of Bally.

87. Upon information and belief, counterclaim-defendant Geoff Scheitlin ("Scheitlin") is a resident of Illinois, served as Bally's Controller from 1997 to 2001, and was Vice President and Treasurer of Bally until 2005.

## Jurisdiction and Venue

88. This Court has subject matter jurisdiction of ACE's counterclaim against the Individual Insureds pursuant to 28 U.S.C. § 1332(a)(1), in that ACE is a citizen of Pennsylvania and the Individual Insureds are citizens of various states other than Pennsylvania, and the amount in controversy exceeds $75,000.

89. This Court also has supplemental jurisdiction of the subject matter of ACE's counterclaim against the Individual Insureds pursuant to 28 U.S.C. § 1367(a). The counterclaim against the Individual Insureds is so related and intertwined with the claims at issue in the remainder of the case that it forms part of the same case or controversy under Article III of the United States Constitution.

90. Venue as to ACE's counterclaim against the Individual Insureds is proper under 28 U.S.C. § 1391(a)(2), in that a substantial part of the events giving rise to the counterclaim occurred in this district.

### Factual Allegations

91. ACE underwrote the 02/03 ACE Policy after receiving from Bally a completed Publicly Traded Corporation Renewal Proposal Form, dated April 12, 2002 and signed by Dwyer (the "2002 Proposal Form"). The 2002 Proposal Form had been provided to Bally in blank by Great American Insurance Company ("GAIC") in connection with its underwriting of the 02/03 GAIC Primary Policy.

92. The 2002 Proposal Form stated that copies of all of the following Bally documents were deemed attached to and made a part of it:

i.  Annual Report (Complete Audited Financial Statement), for the most recent three (3) years.

ii. Latest Interim Financial Statement.

iii. The most recent 10-K, 10-Q, and any other document filed with the Securities and Exchange Commission.

iv. The Notice to Stockholders and Proxy Statement for the last scheduled meeting.

- 24 -

      v.    If applicable, the most recent year end and quarterly Convention Statements.

      vi.    If applicable, the most recent year end and quarterly Call Reports.

93.    The 2002 Proposal Form thus incorporated, among other things, Bally's Annual Report for the years 1999, 2000 and 2001, as well as Bally's then most recent Form 10-K, Interim Financial Statement, and Form 10-Q. Under the express terms of the 2002 Proposal Form, Bally and each of the Individual Insureds agreed: (i) that the statements and information contained in the 2002 Proposal Form, including the financial statements and other materials incorporated therein, were their representations and the basis of the 02/03 ACE Policy; (ii) that those representations were material to the acceptance of the risk by ACE; and (iii) that the 02/03 ACE Policy was being issued in reliance upon the truth of such representations.

94.    The 2002 Proposal Form also contained the following statements attesting to the accuracy of the information supporting the application for insurance coverage:

> The undersigned Officer of the Company declares that to the best of his or her knowledge the statements set forth herein are true and correct and that reasonable efforts have been made to obtain sufficient information from each and every Director and Officer proposed for this insurance to facilitate the proper and accurate completion of this Proposal Form. The undersigned further agrees that if any significant adverse change in the condition of the applicant is discovered between the date of this Proposal Form and the effective date of the Policy, which would render this Proposal Form inaccurate or incomplete, notice of such change will be reported in writing to the Insurer immediately. The signing of this Proposal Form does not bind the undersigned to purchase the insurance.

95.    In addition, the 02/03 ACE Policy, by its express terms, is subject to and incorporates the terms and conditions of the 02/03 GAIC Primary Policy. The 02/03 ACE Policy thus incorporates Section IX.B of the 02/03 GAIC Primary Policy, which states:

- 25 -

It is agreed by the Company and the Insured Persons that the particulars and statements contained in the Proposal Forms and any information provided therewith (which shall be on file with the Insurer and be deemed attached hereto as if physically attached hereto) are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy. It is further agreed by the Company and the Directors and Officers that the statements in the Proposal Forms or in any information provided therewith are their representations, that they are material and that this Policy is issued in reliance upon the truth of such representations; provided, however, that except for material facts or circumstances known to the person(s) who subscribed the Proposal Forms, any misstatement or omission in such Proposal Forms or information provided therewith in respect of a specific Wrongful Act by a particular Director or Officer or his cognizance of any matter which he has reason to suppose might afford grounds for a future Claim against him shall not be imputed to any other Director or Officer for purposes of determining the validity of this Policy as to such other Director or Officer.

96.     Moreover, the 02/03 Gulf Policy states, at paragraph II.C:


### C.   STATEMENTS IN THE APPLICATION

It is a condition to the Insurer's obligations under this Policy and the Insureds agree that the statements made in the Application, and any attachments thereto and materials submitted therewith, all of which shall be deemed attached hereto and incorporated herein, are material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such statements and representations.

The 02/03 ACE Policy, by its express terms, is subject to and incorporates these provisions of the

02/03 Gulf Policy.


97.     In reliance upon the truth of the information contained in the 2002

Proposal Form, including the financial statements and other materials incorporated therein, ACE

issued the 02/03 ACE Policy.

98.     Unbeknownst to ACE, the financial statements incorporated into the 2002 Proposal Form materially misstated the true financial condition of Bally.

99.     In a March 11, 2004 press release, Bally announced that it had determined to change its prior method of estimation-based deferral accounting õto a preferable, modified cash basis of accountingö for membership revenues, and that it had reduced the balance sheet carrying value of its deferred tax assets and corrected an error in its recognition of prepaid dues. These measures resulted in total non-cash charges to Ballyøs balance sheet of $675,000,000.

100.     In an April 28, 2004 press release, Bally announced, without explanation, the resignation of Dwyer as its Chief Financial Officer, and revealed that the Company itself had become the subject of an investigation by the Securities and Exchange Commission (õSECö) regarding the timing of recognition of prepaid dues.

101.     In a press release issued on November 15, 2004, Bally announced that its Audit Committee had concluded, following an internal investigation, that the Companyøs financial statements for the years ended December 31, 2000 through December 31, 2003, and for the first quarter of 2004, must be restated, and that õ[a]ccordingly, such financial statements and other communications related to such periods should no longer be relied upon.ö  The Audit Committee determined, among other things, that as of the fiscal year 2000, Bally õshould have changed its revenue recognition policy for membership initiation feesö and that õthe Companyøs recognition of revenue associated with recoveries of unpaid dues on inactive membership contracts was in error.ö

102.     In a February 8, 2005 press release, Bally announced that its Audit Committee had completed its investigation of the Companyøs accounting issues.    That

- 27 -

investigation uncovered "multiple accounting errors" and determined that Bally had taken "aggressively optimistic positions on several matters related to the analysis of the adequacy of the allowance for doubtful accounts, which were without a reasonable empirical basis." The Audit Committee concluded that Hillman, Bally's former Chief Executive Officer and Director, and Dwyer, Bally's former Chief Financial Officer, were responsible for the accounting errors and for "creating a culture within the accounting and finance groups that encouraged aggressive accounting." Bally announced that it had terminated the severance payments to Hillman and Dwyer and was exploring its legal options against them. Bally also noted that the Audit Committee's investigation had determined that Noncek and Scheitlin had engaged in improper conduct and that, as a result, those two officers had been terminated.

103. On November 30, 2005, as part of its Form 10-K for the year ended December 31, 2004, Bally restated its consolidated financial statements for the years 2000 through 2003 and for the first quarter of 2004, explaining that the restatement was necessary to correct improper accounting policies and practices in the following areas: revenue recognition; long-lived assets; goodwill and other intangible assets; leases; accrued liabilities; capitalized software development costs; insured obligations containing retained risk; transfers of obligatory member payments to third parties; and inventory valuation.

104. The restatement was massive, reflecting that in the years 2000 and 2001, for example:

       (a)    Net Revenue had been overstated by $50.34 million in 2000 and by $41.95 million in 2001;

       (b)    Operating Income had been overstated by $112.6 million in 2000 (from a positive $51.4 million to a negative $61.2 million) and by $84.1 million in 2001 (from a positive $57.8 million to a negative $26.3 million);

(c)    Total Assets had been overstated by $1.064 billion in 2000 and by $1.08 billion in 2001;

(d)    Shareholdersø Equity had been overstated by $1.58 billion in 2000 (from a positive $297.8 million to a negative $1.286 billion) and by $1.77 billion in 2001 (from a positive $512.7 million to a negative $1.253 billion);

(e)    Basic Earnings Per Share had been overstated by $8.42 (256%) in 2000 and by $6.26 (215%) in 2001; and

(f)    Diluted Earnings Per Share had been overstated by $7.97 (281%) in 2000 and by $6.05 (224%) in 2001.

105.    In the wake of these events, Bally and the Individual Insureds were named in one or more of various lawsuits or became the subject of certain other claims or potential claims (collectively, the õBally Mattersö).

106.    Bally and the Individual Insureds have sought coverage for some or all of the Bally Matters under the 02/03 ACE Policy, and ACE has previously notified Bally and the Individual Insureds that it is rescinding the 02/03 ACE Policy and has tendered all premium paid therefor.

107.    The 2002 Proposal Form submitted to ACE on behalf of Bally and the Individual Insureds, including the financial statements and other materials incorporated therein and made a part thereof, contained material misrepresentations or false warranties either made with the actual intent to deceive or that materially affected the acceptance of the risk or the hazard assumed by ACE.

108.    ACE did not know that the 2002 Proposal Form included false information, and relied upon the truth of such information in underwriting and issuing the 02/03 ACE Policy.

- 29 -

109.     Had ACE known that the 2002 Proposal Form and the financial statements and other materials incorporated therein contained false information, and had it known the truth about Bally's financial condition, it would not have issued the 02/03 ACE Policy or would only have issued a policy on different terms.

110.     The 02/03 ACE Policy is therefore void *ab initio* or voidable, and ACE is entitled to a declaration, pursuant to 28 U.S.C. § 2201, that the policy is rescinded and of no force or effect.

WHEREFORE, ACE demands judgment in its favor and against Bally and the Individual Insureds as follows:

A.     dismissing Count I of the third-party complaint as to ACE;

B.     on the counterclaim, declaring that the 02/03 ACE Policy is void *ab initio* or voidable, rescinded and of no force or effect;

C.     awarding ACE its costs and reasonable attorneys' fees in connection with this action; and

D.     granting ACE such other and further relief as the Court may deem proper.

Dated:  July 26, 2007

Of Counsel:

Philip S. Kaufman
Julie Weiswasser
KRAMER LEVIN NAFTALIS &
 FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Tel. No.:  212-715-9100
Fax No.:  212-715-8000

WALKER WILCOX MATOUSEK LLP

By:     /s/ Neil E. Holmen
        Neil E. Holmen (1250027)
        Edward P. Gibbons (#6201189)
        Paul F. Matousek (#6196131)
        225 W. Washington Street, Suite 2400
        Chicago, Illinois 60606-3418
        Tel. No.  312-244-6700
        Fax No.  312-244-6800

        Attorneys for ACE American Insurance Company

- 30 -

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on July 26, 2007, I electronically filed **Answer and Counterclaim of Third-Party Defendant and Counterclaimant ACE American Insurance Company,** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following: **Robert B. Baker** (rbaker@sbchicago-law.com); **Nader R. Boulos** (nboulos@kirkland.com); **Michael Foradas** (mforadas@kirkland.com); **David Goldhaber** (david.goldhaber@sdma.com); **Thomas Hanekamp** (thanekamp@tsmp.com); **James Murray** (jmurray@tsmp.com); **Kevin O'Hagan** (kohagan@ohaganspencer.com); **Kristine Phillips** (kphillips@ohaganspencer.com); **William Pruitt** (wpruitt@kirkland.com); **Luke Sheridan** (lsheridan@ohaganspencer.com); **David Subramanian** (david.subramanian@sdma.com); **Leonard Surdyk** (lsurdyk@sbchicago-law.com); **James Walsh** (jwalsh@londonfischer.com). I also certify that, on July 26, 2007, a copy of the aforementioned document was mailed to the following non-participant of the CM/ECF system:

>Michael R. Davisson
>Susan Koehler Sullivan
>Sedgwick, Detert, Moran & Arnold LLP
>801 South Figueroa Street
>18th Floor
>Los Angeles, CA  90017

>Dated:  July 26, 2007.            Respectfully submitted,

>             s/Neil E. Holmen
>             Neil E. Holmen (1250027)
>             Edward P. Gibbons (#6201189)
>             Paul F. Matousek (#6196131)
>             225 W. Washington Street, Suite 2400
>             Chicago, Illinois 60606-3418
>             Tel. No.  312-244-6700
>             Fax No.  312-244-6800

>             Attorneys for ACE American Insurance Company

- 31 -