**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GREAT AMERICAN INSURANCE )
COMPANY, an Ohio corporation, )
                            )
      Plaintiff, )
                            )      Case No. 1:06-cv-04554
      v. )
                            )      Hon. Wayne R. Andersen
                            )
                            )      Magistrate Judge Martin C. Ashman
                            )
BALLY TOTAL FITNESS HOLDING )      **JURY TRIAL DEMANDED**
CORPORATION, a Delaware corporation, )
                            )
      Defendant and Third-Party )
                  Plaintiff, )
      v. )
                            )
RLI INSURANCE COMPANY; )
TRAVELERS INSURANCE COMPANY; )
FIREMAN'S FUND INSURANCE )
COMPANY; and ACE AMERICAN )
INSURANCE COMPANY, )
                            )
      Third-Party Defendants. )
_____)
                            )
RLI INSURANCE COMPANY; )
TRAVELERS INSURANCE COMPANY; )
FIREMAN'S FUND INSURANCE )
COMPANY; and ACE AMERICAN )
INSURANCE COMPANY, )
                            )
      Third-Party Defendants, )
                            )
      v. )
                            )
HOLIDAY UNIVERSAL, INC. (except )
as to ACE AMERICAN INSURANCE )
COMPANY); GEORGE N. ARONOFF; )
PAUL TOBACK; JOHN W. DWYER; )
LEE S. HILLMAN; STEPHEN SWID; )
JAMES McANALLY; J. KENNETH )

LOOLOIAN; LIZA M. WALSH; ANNIE )
P. LEWIS, as Executor of the Estate of )
Aubrey Lewis, deceased; THEODORE )
NONCEK; GEOFF SCHEITLIN; )
JOHN H. WILDMAN; JOHN W. )
ROGERS, JR.; and MARTIN W. )
FRANKLIN, )
 )
       Additional Defendants. )
 )
———————————————— )
 )
GREAT AMERICAN INSURANCE )
    COMPANY, )
 )
       Cross-Plaintiff, )
 )
       v. )
 )
GEORGE N. ARONOFF; )
PAUL TOBACK; JOHN W. DWYER; )
LEE S. HILLMAN; STEPHEN SWID; )
JAMES McANALLY; J. KENNETH )
LOOLOIAN; LIZA M. WALSH; ANNIE )
P. LEWIS, as Executor of the Estate of )
Aubrey Lewis, deceased; THEODORE )
NONCEK; GEOFF SCHEITLIN; )
JOHN H. WILDMAN; JOHN W. )
ROGERS, JR.; MARTIN W. )
FRANKLIN and HOLIDAY )
UNIVERSAL, INC., )
 )
       Cross-Defendants. )

## CROSS-CLAIM FOR RESCISSION OF PLAINTIFF, COUNTER-DEFENDANT AND CROSS-PLAINTIFF GREAT AMERICAN INSURANCE COMPANY

NOW COMES Great American Insurance Company ("GAIC" or "Cross-Plaintiff") and for its Cross-Claim for Rescission ("Cross-Claim") against George N. Aronoff ("Aronoff"), Paul Toback ("Toback"), John H. Dwyer ("Dwyer"), Lee S. Hillman ("Hillman"), Stephen C. Swid ("Swid"), James McAnally ("McAnally"), J. Kenneth Looloian ("Looloian"), Liza M. Walsh ("Walsh"), Annie P. Lewis, Executor of

the Estate of Aubrey C. Lewis, deceased ("Lewis"), Theodore Noncek ("Noncek"), John H. Wildman ("Wildman"), John W. Rogers, Jr. ("Rogers"), Martin E. Franklin ("Franklin"), Geoff Scheitlin ("Scheitlin") and Holiday Universal, Inc. ("Holiday Universal") (Aronoff, Toback, Dwyer, Hillman, Swid, McAnally, Looloian, Walsh, Lewis, Noncek, Wildman, Rogers, Franklin, Scheitlin and Holiday Universal sometimes herinafter collectively the "Cross-Defendants"), states as follows:

### Nature of the Action

1.      GAIC originally initiated this action to rescind and have declared void *ab initio* certain primary directors' and officers' liability insurance Policies (as hereinafter defined) that it issued to Bally Total Fitness Holding Corporation ("Bally"), which purported to insure Bally and the Cross-Defendants. GAIC originally sued only Bally, and now files this Cross-Claim against the Cross-Defendants. GAIC underwrote and issued the Policies in reliance upon applications submitted to it by or on behalf of Bally and/or the Cross-Defendants. Unbeknownst to GAIC, these applications, which included various financial statements of Bally, contained materially false and misleading information and seriously misstated Bally's true financial condition.

2.      As detailed below, after the Policies were issued (and after a number of claims had been reported by Bally), Bally issued press releases in which it announced, *inter alia*, that it had changed its accounting method for membership revenues, had reduced the balance sheet carrying value of its deferred tax assets, and had corrected errors in the recognition of prepaid dues, resulting in a total of $675,000,000 in non-cash charges, including: (1) $581,000,000 reflecting the cumulative effect, as of the beginning of 2003, of the changes in accounting principles; (2) $51,000,000 related to a special tax

charge recorded effective the first quarter of 2003; and (3) a $43,000,000 restatement of its financial statements for the year ended December 31, 2002.

3.    More significantly, in a press release dated November 15, 2004, Bally announced a further, and massive, restatement of its financial statements for the years ended December 31, 2000 through December 31, 2003, and for the first quarter of 2004. While the precise amount of the restatement was not announced, Bally reported that the expected restatement would at least include the $581,000,000 amount referenced above, which would now be treated as a cumulative, non-cash charge as of January 1, 2000. Bally's Audit Committee announced in the same November 15, 2004 press release that these financial statements and other communications related to these periods should no longer be relied upon.  Bally's restatements encompass the very financial statements on which GAIC relied in underwriting and issuing the Policies.

4.    As a result of the foregoing, Bally and various of its directors and officers (including most of the Cross-Defendants) were named as defendants in numerous class action and shareholder derivative lawsuits filed in the United States District Court for the Northern District of Illinois, the United States District Court for the District of Oregon, and the Circuit Court of Cook County Illinois, County Department, Chancery Division, charging them, *inter alia*, with violation of federal and state securities laws, breach of fiduciary duty, and other misconduct.  In addition, the Division of Enforcement of the Securities and Exchange Commission (the "SEC") commenced an investigation (the "SEC Investigation") regarding Bally's accounting practices and financial restatements, and Bally received a request for information from the office of the United States Attorney for the District of Columbia in connection with a criminal investigation it is conducting

(the "DOJ Investigation"). Bally and at least one of its officers, along with Holiday Universal, were also named as defendants in proceedings unrelated to Bally's accounting issues. Bally (and, directly or indirectly, the Cross-Defendants) claim coverage under the Policies in connection with one or more of these matters.

5.      On November 30, 2005, Bally filed a Form 10-K with the SEC in which, *inter alia*, it sets forth restated financial results for the years 2000 and 2001. One significant effect of the restatement is that Bally went from *positive* Stockholders' Equity of $297.8 million and 512.7 million as of December 31, 2000 and December 31, 2001, respectively, to a *deficit* of $1.285 billion as of December 31, 2000, and a *deficit* of $1.252 billion as of December 31, 2001. Put another way, Bally overstated its Stockholders' Equity *by over $1.5 billion* in its original financials for the year ended December 31, 2000, and overstated its Stockholders' Equity *by over $1.7 billion* in its original financials for the year ended December 31, 2001 – the very financials relied upon by GAIC in underwriting the Policies.

6.      Had GAIC known that the financial statements contained in the applications submitted to it by Bally and the Cross-Defendants materially misrepresented Bally's financial condition, and would have to be restated by hundreds of millions of dollars, GAIC would not have issued the Policies. GAIC therefore seeks to rescind the Policies and have this Court declare the Policies void *ab initio* and of no force or effect.

### The Plaintiff

7.      Plaintiff GAIC is an Ohio corporation with its principal place of business in Cincinnati, Ohio. GAIC underwrote and issued to Bally (to insure Bally, and certain Individual Insureds, including the individual Cross-Defendants) primary Directors',

Officers', Insured Entity and Employment Practices Liability Insurance Policy No. DOL5741464 for the Policy Period June 30, 2001 to June 30, 2002, with an Aggregate Limit of Liability for the Policy Period of $20,000,000 (the "01/02 Policy") and primary Directors', Officers', Insured Entity and Employment Practices Liability Insurance Policy No. DOL5741464 for the Policy Period June 30, 2002 to June 30, 2003, with an Aggregate Limit of Liability for the Policy Period of $10,000,000 (the "02/03 Policy") (the 01/02 Policy and the 02/03 Policy sometimes referred to herein as the "Policies"). Each of the "Bally Matters" (as briefly discussed above and as hereinafter defined) has been reported by Bally and/or by one or more of the Cross-Defendants to GAIC under either the 01/02 Policy or the GAIC 02/03 Policy. True and accurate copies of the 01/02 Policy and the 02/03 Policy are included as Exhibits A and B, respectively, in the Appendix of Exhibits to this Cross-Claim ("Appendix") filed together herewith, and are incorporated by reference herein.

### Bally

8.      Bally (the primary defendant in the instant rescission action filed by GAIC) is a Delaware corporation with its principal place of business in Chicago, Illinois.

### The Cross-Defendants

9.      Upon information and belief, Cross-Defendant Aronoff is a citizen of Florida and was a director of Bally from August 24, 2001 to March 19, 2003.

10.      Upon information and belief, Cross-Defendant Toback is a citizen of Illinois, was Chairman of Bally from 2003 to 2006, and served as President, Chief Executive Officer and as a director of Bally from 2002 to 2006.

11. Upon information and belief, Cross-Defendant Dwyer is a citizen of Illinois and was Executive Vice President and Chief Financial Officer of Bally between 1996 and 2004, and served as a director of Bally prior to and until 2004.

12. Upon information and belief, Cross-Defendant Hillman is a citizen of Ilinois, was Chairman of Bally from 2002 to 2003, President and Chief Executive Officer of Bally from 1996 to 2003, and a director of Bally from 1992 to 2003.

13. Upon information and belief, Cross-Defendant Swid is a citizen of New York, and at times relevant hereto served as a director of Bally.

14. Upon information and belief, Cross-Defendant McAnally is a citizen of New Jersey, and at times relevant hereto served as a director of Bally.

15. Upon information and belief, Cross-Defendant Looloian is a citizen of New Jersey, and at times relevant hereto served as a director of Bally.

16. Upon information and belief, Cross-Defendant Walsh is a citizen of New Jersey, and at times relevant hereto served as a director of Bally.

17. Upon information and belief, Cross-Defendant Lewis is a citizen of New Jersey, and is the Executor of the Estate of Aubrey C. Lewis, deceased, who at times relevant hereto served as a director of Bally.

18. Upon information and belief, Cross-Defendant Noncek is a citizen of Illinois, and was Vice President and Controller of Bally from 2000 until February 2005.

Upon information and belief, Cross-Defendant Wildman is a citizen of Illinois, and is currently an officer of Bally.

19. Upon information and belief, Cross-Defendant Rogers is a citizen of Illinois, and at times relevant hereto served as a director of Bally.

20.     Upon information and belief, Cross-Defendant Franklin is a citizen of New York, and at times relevant hereto served as a director of Bally.

21.     Upon information and belief, Cross-Defendant Scheitlin is a citizen of Illinois, served as Bally's Controller from 1997 to 2001, and was Vice President and Treasurer of Bally until 2005.

22.     Upon information and belief, Cross-Defendant Holiday Universal is a Delaware corporation with its principal place of business in Illinois, and is a direct or indirect subsidiary of Bally.

### Underlying Actions and Reporting and Defense Thereof

23.     Bally and certain of its officers and/or directors (including most of the Cross-Defendants) were named as defendants in a number of securities class actions pending in the United States District Court for the Northern District of Illinois, including *Petkun, et al. v. Bally Total Fitness Holding Corp., et al.,* Case No. 04c 3530, which cases (collectively, the "Securities Litigation") were consolidated under the same case number as *Petkun.*

24.     Bally and certain of its officers and/or directors (including most of the Cross-Defendants) were also named as defendants in a related action pending in the United States District Court for the District of Oregon, entitled *Garrison, et al, v. Bally Total Fitness Holding Corp., et al.,* Case No. CV04 1331 (the "Oregon Securities Litigation").

25.     Bally and certain of its officers and/or directors (including most of the Cross-Defendants) were also named as defendants in three separate shareholder derivative actions (collectively, the "Derivative Litigation") that are likewise related to

the Securities Litigation. Two of these actions – *Berra, et al. v. Toback, et al.*, Case No. 04CH09132, and *Schachter, et al. v. Toback, et al*., Cases No. 04CH09131 – were filed in the Circuit Court of Cook County, Illinois, County Department, Chancery Division. The third -- *Said, et al. v. Toback, et al.*, Case No. 05C 1981— was filed in the United States District Court for the Northern District of Illinois.

26.     In addition, as set forth above, Bally and certain of its officers and/or directors are the subject of both the SEC Investigation and the DOJ Investigation, each of which appears to arise, at least in substantial part, from the restatement of Bally's financial statements. Bally has also received a shareholder demand to bring actions or seek either remedies against parties potentially responsible for accounting errors (the "Shareholder Demand").

27.     Moreover, Bally and certain of its officers and/or directors (including certain of the Cross-Defendants) were named as defendants in an action pending in the United States District Court for the District of Massachusetts, entitled *Fit Tech, Inc., et al. v. Bally Total Fitness Holding Corp*., et al., Case No. 03CV10295 (the "Fit Tech 03 Litigation"), and in a separate action (related to both the Fit Tech 03 Litigation and the Securities Litigation) pending in the United States District Court for the District of Massachusetts, entitled *Fit Tech, Inc., et al. v. Bally Total Fitness Holding Corp., et al*., Case No. 0510471 MEL (the "Fit Tech 05 Litigation").

28.     Bally and at least one individual associated with Bally (who is a Cross-Defendant) were also named as defendants in a lawsuit originally filed in the Court of Common Pleas of Cuyahoga County, Ohio, entitled *Butcher v. Bally Total Fitness Corporation, et al.,* Case No. CV 02 458434.  ("Butcher").

29.     The Securities Litigation, the Oregon Securities Litigation, the Derivative Litigation, the SEC Investigation, the DOJ Investigation, the Shareholder Demand, the Fit Tech 03 Litigation, the Fit Tech 05 Litigation, and Butcher are sometimes hereinafter referred to collectively as the "Bally Matters." (In addition to the matters specifically described herein, certain additional or amended complaints or matters have been filed or commenced that are or appear to be related to one or more of the Bally Matters. For purposes of this Complaint, such matters are within the definition of the Bally Matters.) Bally, along with the individual officers, directors and employees of Bally named in the various Bally Matters (including the Cross-Defendants), are sometimes hereinafter called the "Bally Parties." The Bally Matters have been reported to GAIC and other excess insurers by or on behalf of one or more of the Bally Parties, and the Bally Parties seek coverage from GAIC and the other insurers under the Policies, and pertinent excess policies, with respect to some or all of such matters.

30.     In order to facilitate the orderly defense of the Bally Matters while preserving all of their respective rights, remedies and defenses under and in connection with the Policies, the Bally Parties and GAIC entered into an Interim Fee Advancement and Non-Waiver Agreement made to be effective on April 27, 2005, and subsequently modified in part by Addendum No. 1 to Interim Fee Advancement and Non-Waiver Agreement and by Addendum No. 2 to Interim Fee Advancement and Non-Waiver Agreement (collectively the "Interim Funding and Non-Waiver Agreement"). A true and correct copy of the Interim Funding and Non-Waiver Agreement (including the two addenda) has been filed with the Court in this action See PACER Document No. 33, Affidavit of Rober B. Baker, Exhibit 14).

31.    Pursuant to the Interim Funding and Non-Waiver Agreement, the Bally Parties and GAIC agreed, *inter alia*, that GAIC would advance Costs of Defense to one or more of the Bally Parties in connection with the Bally Matters, and that such advancement would not in any way serve to prejudice or waive any of GAIC's defenses under or in connection with the Policies, including but not limited to GAIC's defense that the Policies are void *ab initio* and subject to rescission. Further, the Interim Funding and Non-Waiver agreement provides that GAIC may recoup amounts paid to the Bally Parties in connection with the Bally Matters, upon a determination that such amounts were not owed (e.g. because the Policies are void *ab initio* and subject to rescission).

32.    Subject to the foregoing, GAIC has advanced Costs of Defense in connection with the Bally Matters. Indeed, GAIC's payments for Costs of Defense in connection with the 02/03 Policy (these relate to each of the Bally Matters except for Butcher) were sufficient to exhaust the $10,000,000 Aggregate Limit of Liability of the 02/03 Policy. Costs of Defense associated with Butcher have impaired but not exhausted the limit of the 01/02 Policy.

33.    Pursuant to the Interim Funding and Non-Waiver Agreement, all of the sums paid were paid to Bally. Under the terms of the Interim Funding and Non-Waiver Agreement, GAIC is entitled to seek recoupment from Bally of amounts paid to Bally.

### Jurisdiction

34.    This Court has jurisdiction over the subject matter of this Cross-Claim pursuant to 28 U.S.C. Section 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

35.     This Court also has supplemental jurisdiction over the subject matter of this Cross-Claim pursuant to 28 U.S.C. Section 1367(a). The Cross-Claim against the Cross-Defendants is so related and intertwined with the claims at issue in the remainder of the case that it forms part of the same case or controversy under Article III of the Constitution of the United States.

36.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(a), as defendant Bally and a number of the Cross-Defendants are residents of the judicial district in which this action is brought.

### The Underwriting of the Policies

37.     Both the 01/02 Policy and the 02/03 Policy were underwritten by GAIC in reliance upon Bally's submission to GAIC of a Publicly Traded Corporation Renewal Proposal Form ("Proposal Form"). The Proposal Form for the 01/02 Policy is dated June 27, 2001 and was signed by Bally Chief Financial Officer Dwyer (the "2001 Proposal Form"). The Proposal Form for the GAIC 02/03 Primary Policy is dated April 12, 2002 and was again signed by Bally Chief Financial Officer Dwyer (the "2002 Proposal Form") (the 2001 Proposal Form and the 2002 Proposal Form sometimes hereinafter collectively the "Proposal Forms"). While the Proposal Forms are attached to and made part of the GAIC 01/02 Primary Policy and the GAIC 02/03 Primary Policy, for ease of reference they are included as Exhibits C and D, respectively, in the accompanying Appendix, and are incorporated by reference herein.

38.     Each of the Proposal Forms contains the following statements attesting to the accuracy of the information provided to GAIC by Bally and the individual Bally Parties (i.e. the Cross-Defendants) in support of their request for insurance coverage:

The undersigned Officer of the Company declares that to the best of his or her knowledge the statements set forth herein are true and correct and that reasonable efforts have been made to obtain sufficient information from each and every Director and Officer proposed for this insurance to facilitate the proper and accurate completion of this Proposal Form. The undersigned further agrees that if any significant adverse change in the condition of the applicant is discovered between the date of this Proposal Form and the effective date of the Policy, which would render this Proposal Form inaccurate or incomplete, notice of such change will be reported in writing to the Insurer immediately. The signing of this Proposal Form does not bind the undersigned to purchase the insurance.

(Exhibits C and D.)

39.     Bally and each of the individual Bally Parties (i.e. the Cross-Defendants) also affirmed that all of the statements contained in the Proposal Forms, including, *inter alia*, the financial statements incorporated into the Proposal Forms, were their representations, that those representations were material to the issuance of any policy, and that any policy would be issued in reliance upon the truth of such representations. As stated in the Proposal Forms:

It is agreed by the Company and the Insured Persons that the particulars and statements contained in this Proposal Form and any information provided herewith (which shall be on file with the Insurer and be deemed attached hereto as if physically attached hereto) are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy. It is further understood and agreed by the Company and the Directors and Officers that the statements in this Proposal Form or any information provided herewith are their representations, that they are material and that this Policy is issued in reliance upon the truth of such representations; provided, however, that except for material facts or circumstances known to the person who subscribed this Proposal Form, any misstatement or omission in this Proposal Form or information provided herewith in respect of a specific Wrongful Act by a particular Director or Officer or his or her cognizance of any matter which he or she has reason to believe might afford grounds for a future Claim against him or her shall not be imputed to any other Director or Officer for purposes of determining the validity of this Policy as to such other Director or Officer.

(Exhibits C and D.)

40.     In addition to the foregoing, each of the Proposal Forms provides that copies of all of the following Bally documents are deemed attached to and made a part of the Proposal Forms:

i.      Annual Report (Complete Audited Financial Statement), for the most recent three (3) years.
ii.     Latest Interim Financial Statement.
iii.    The most recent 10K, 10Q and any other documentation filed with the Securities and Exchange Commission.
iv.     The Notice of Stockholders and Proxy Statement for the last scheduled meeting.
v.      If applicable, the most recent year end and quarterly Convention Statements.
vi.     If applicable, the most recent year end and quarterly Call Reports.

(Exhibits C and D.)

41.     In accordance with the foregoing, the 2001 Proposal Form incorporated Bally's Annual Report for, *inter alia*, the years 1998, 1999 and 2000, along with Bally's most recent Form 10-K, Interim Financial Statement and Form 10-Q. The 2002 Proposal Form incorporated Bally's Annual Report for, *inter alia*, the years 1999, 2000 and 2001, along with Bally's most recent Form 10-K, Interim Financial Statement and Form 10-Q. Pursuant to the express terms of the Proposal Forms referenced above, the Bally Parties (including the Cross-Defendants) each: (1) acknowledged that the information contained in the incorporated financial statements were their representations; (2) vouched for the truth of the information contained in the incorporated financial statements; and (3) agreed that such information was material to GAIC's underwriting decision and that each of the Policies (the 01/02 Policy and the 02/03 Policy) was being issued in reliance upon the truth of the representations contained in the Proposal Forms and incorporated financial statements.

42.     In reliance upon the information provided in each of the Proposal Forms, including the information contained in the incorporated financial statements, GAIC issued the 01/02 Policy and the 02/03 Policy.

### Bally's Financial Misstatements

43.     Unbeknownst to GAIC, the information contained in the financial statements incorporated into each of the Proposal Forms, upon which GAIC relied in issuing the Policies to Bally (insuring Bally and the other Bally Parties, including Cross-Defendants), materially misstated the true financial condition of Bally.

44.     In a press release dated March 11, 2004, Bally announced that it had elected to change from its prior method of estimation-based deferral accounting "to a preferable, modified cash basis of accounting" for its membership revenues. In related measures, Bally announced that it had reduced the balance sheet carrying value of its deferred tax assets and corrected an error in its recognition of pre-paid dues. Bally further announced that "the accounting change and these actions result in total non-cash charges of $675 million" consisting of (1) $581,000,000 reflecting the "cumulative effect as of the beginning of 2003 of the changes in accounting principles" (the "Cumulative Effect Adjustment"); (2) $51,000,000 related to a special tax charge recorded effective the first quarter of 2003; and (3) $43,000,000 as of December 31, 2002 reflecting as a restatement resulting from the correction of an error related to the prior calculation of prepaid dues.

45.     In its Form 10-K for the year ended December 31, 2003, filed with the SEC on April 2, 2004, Bally reiterated the $581,000,000 Cumulative Effect Adjustment and the $51,000,000 special tax charge referenced in the preceding paragraph.

46.     In a press release dated April 28, 2004, Bally announced, without further explanation, the resignation of Bally Chief Financial Officer Dwyer and, in the same press release, announced the existence of the SEC Investigation, stating that "the Division of Enforcement of the Securities and Exchange Commission has commenced an investigation in connection with the Company's recent restatement regarding the timing of recognition of prepaid dues. The Company is cooperating fully with the SEC in this matter."

47.     In the Securities Litigation, plaintiffs seek or sought certification of a class of persons who purchased Bally's securities on the open market during the period beginning August 3, 1999 and ending April 28, 2004. In the Derivative Litigation, plaintiffs allege breaches of fiduciary duty and other violations by the named Bally Parties beginning in 1999 and continuing through at least April 28, 2004.  In each of these suits, plaintiffs assert that, during the relevant period, Bally, in violation of its own revenue recognition policy as well as Generally Accepted Accounting Principles ("GAAP"), was improperly recognizing revenue relating to non-obligatory pre-paid membership dues, thereby materially inflating its reported revenues and income. Plaintiffs cite specifically to, *inter alia,* Bally's press releases of March 11, 2004 and April 28, 2004, and to Bally's Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on April 2, 2004, as evidence of defendants' violations and ultimate admission of the truth. Similar allegations are lodged against several of the Bally Parties in the Oregon Securities Litigation.

48.     On November 15, 2004, Bally announced in a press release that its Audit Committee had concluded, based on the results of an investigation, that Bally's financial

statements for the years ended December 31, 2000 through December 31, 2003, and the first quarter of 2004, should be restated, and that, "[a]ccordingly, such financial statements and other communications related to such periods should no longer be relied upon." Among other things, the Audit Committee determined that, following the promulgation of Staff Accounting Bulletin No. 101, beginning in fiscal 2000, Bally "should have changed its revenue recognition policy for membership initiation fees" by adopting a policy of recognizing revenue for all membership fees "over the longer of the contractual life or the period over which service was provided." Bally announced that the restatement "will result in a cumulative, non-cash charge as of January 1, 2000, the amount of which has not yet been determined, but will include the amount previously reported as a cumulative effect adjustment when the company converted to a modified cash basis of accounting effective January 1, 2003."

49.     In a press release dated February 8, 2005, Bally reiterated its earlier announcement that it would restate its financial statements from January 1, 2000 through the first quarter of 2004. Bally further announced that its Audit Committee had completed its investigation into various accounting issues. Bally stated that it had reported the investigation results to the SEC and continued to cooperated with the SEC in its ongoing investigation of Bally. In particular, Bally announced that the Audit Committee investigation "found errors in the Company's rationale for and implementation of its deferral of membership acquisition costs" under Bally's prior accounting method. According to Bally, the Audit Committee investigation "also concluded that the Company took aggressively optimistic positions on several matters related to the analysis

of the adequacy of the allowance for doubtful accounts, which were without a reasonable empirical basis."

50.    As also reported in the February 8, 2005 press release, Bally's Audit Committee investigation found multiple accounting errors in Bally's financial statements, finding Bally's former Chief Executive Officer, and former Chief Financial Officer Dwyer, "responsible for multiple accounting errors and creating a culture within the accounting and finance groups that encouraged aggressive accounting." The Audit Committee found that "certain accounting policies and positions were suggested and implemented without a reasonable empirical basis and concluded that Dwyer made a false and misleading statement to the SEC." Bally announced that, as a result of these findings, the Company had decided "to make no further payments to Messrs. Hillman and Dwyer under their severance arrangements and will evaluate its legal options with respect to these former executives." In addition, Bally announced that the investigation found improper conduct by Bally's Vice President and Controller Noncek and Vice President and Treasurer Scheitlin. As a result, Bally stated that it terminated both Noncek and Scheitlin.

51.    In addition to the foregoing, in its February 8, 2005 press release Bally announced that its Audit Committee found material weakness in Bally's internal controls over financial reporting, including deficiencies in Bally's finance and accounting internal control environment. Specifically, the Audit Committee noted a lack of acceptable and clearly communicated policies reflecting management's attitudes toward financial reporting and the financial reporting function, the lack of a permanent Chief Financial Officer, ineffective delegation of authority and responsibility, insufficient instruction to

employees responsible for significant estimates emphasizing the need to report using accurate and reasonable assumptions and judgments, and insufficiently experienced and trained staff. The Audit Committee also found material weaknesses including deficiencies in the controls surrounding the selection and application of accounting principles, including ineffective policies requiring contemporaneous documentation of factual support for key judgments applied within its financial reporting process and the retention of that documentation in accordance with a formal document retention policy.

52.     Eight days later, in a press release dated February 16, 2005, Bally announced that, following its recent disclosure of the results of its Audit Committee investigation, Bally received notice of the DOJ Investigation. In the same February 16, 2005 press release, Bally acknowledged receipt of the Shareholder Demand.

53.     In a press release dated September 19, 2005, Bally announced that it expected to complete its multi-year audit and file its financial statements by November 30, 2005. In a press release dated November 30, 2005 Bally announced its financial results for the first nine months of 2005 and year-end 2004 and that it had completed the restatement of its 2003 and 2002 results. According to Bally, the restatement reflected "the correction of numerous errors in our previous financial accounting and reporting. The more than two dozen restatement items included corrections related to the recognition of revenue, valuation adjustments of long-lived assets and goodwill and other intangible assets, lease accounting and income taxes."

54.     In the same November 30, 2005 press release, Bally noted that "these restatement adjustments resulted in an increase in previously reported net loss of approximately $96.4 million for the year ended December 31, 2002 and a decrease of

$540 million in net loss for the year ended December 31, 2003." According to Bally, "the decrease in 2003 reported net loss includes the reversal of the cumulative effect of a change in accounting previously reported in 2003 of $581 million. The Company also increased the January 1, 2002 opening accumulated stockholders' deficit by $1.7 billion to recognize the effects of corrections in financial statements prior to 2002."

55. On November 30, 2005, Bally filed its Form 10-K for the fiscal year ended December 31, 2004. This included a discussion of Bally's restatement of results for prior periods. When GAIC underwrote the Policies, it relied in significant part on Bally's materially misstated financial statements for the years ended December 31, 2000 and December 31, 2001. Among other things, these reflected *positive* Stockholders' Equity of $297.8 million and 512.7 million as of December 31, 2000 and December 31, 2001, respectively. In sharp contrast, the restated financials for these same periods, as set forth in the November 30, 2005 Form 10-K, show a Stockholders' Equity *deficit* of $1.285 billion as of December 31, 2000, and a Stockholders' Equity *deficit* of $1.252 billion as of December 31, 2001. (November 30, 2005 Form 10-K, p. 34.) Put another way, Bally overstated its Stockholders' Equity *by over $1.5 billion* in its original financials for the year ended December 31, 2000, and *by over $1.7 billion* in its original financials for the year ended December 31, 2001 – the very financials relied upon by GAIC in underwriting the Policies.

56. In its November 30, 2005 Form 10-K Bally also said the following:

The financial information contained herein for the years ended December 31, 2000 and 2001 are restated and unaudited. The financial statements for the years ended December 31, 2002 and 2003 are restated and, along with the financial statements for the year ended December 31, 2004, have been audited by KPMG LLP, independent public accountants ("KPMG"), whom we engaged on May 18, 2004 following the resignation

on March 25, 2004 of our previous independent public accountants, Ernst & Young LLP ("E&Y").

*     *     *

Effective January 1, 2003, the Company implemented accounting changes to adopt a modified cash basis of accounting, to change its method of accounting for recoveries of unpaid dues on inactive membership contracts and to expense membership origination costs as incurred. In conjunction with these changes in accounting, the Company also determined that its accounting for deferred revenue related to the prepayment of membership dues in prior years was in error, resulting in approximately $43 million in accelerated prepaid dues being recognized. As a result, in April 2004 the Company restated the years prior to 2003 to correct this error. The company reported a cumulative effect adjustment to stockholders' equity as of that date of $380.3 million related to the change to the modified cash method, $119.5 million related to the change to expense membership origination costs, and $20.3 million related to the change in accounting for recoveries of unpaid dues on inactive membership contracts. Additionally, the company recorded a cumulative effect adjustment as of January 1, 2003 of $60.8 million upon the adoption of EITF 00-21, "Revenue Arrangements with Multiple Deliverables."

(November 30, 2005 Form 10-K, pp. 4-5.)

57. In the same Form 10-K, Bally said the following:

Following the company's filing of its annual Report on Form 10-K for 2003, which included financial statements for the year-ended December 31, 2003 reflecting, among other things, certain changes in its accounting methods and in accounting principles and a restatement of the Company's accounting for prepaid dues, the SEC initiated an investigation and the SEC's Division of Corporation Finance undertook a review of the Annual Report. Subsequently, the Audit Committee of the Board undertook an independent investigation of certain aspects of the past financial statements filed by the Company and determined that financial statements for the years ended December 31, 2000, 2001, 2002 and 2003 should be restated and should no longer be relied upon.

In November 2004, the Audit Committee announced that based on the results of the investigation led by independent legal counsel at Bingham McCutchen LLP ("Bingham") who consulted with accounting experts PricewaterhouseCoopers LLP ("PwC") and Marshall Wallace, both retained by Bingham, and in consultation with KPMG, it had determined that:

- following the 1999 promulgation of Staff Accounting Bulletin No. 101, "Revenue Recognition," beginning in the year ended December 31, 2000, the Company should have changed its revenue recognition policy for membership initiation fees. The Audit Committee determined that the Company should have recognized all membership fees over the longer of the contractual life or the period over which services are expected to be provided, and concluded that the deferred pool method used by the Company did not meet this standard of recognition as the recognition period was in most cases shorter than the contractual life. Additionally, the Audit Committee determined that the 2003 adoption of the modified cash basis method of accounting for revenue recognition failed to defer initial membership fee revenue beyond the initial contract for certain members who are expected to maintain their membership beyond the initial period of membership (36 months in most markets) and therefore required changes to extend recognition over such renewal periods;

- prior to the second quarter of 2003, the Company's recognition of revenue associated with recoveries of unpaid dues on inactive member contracts was in error (See Restatement -- 2003 Changes in Accounting and Restatement);

- Bally's allowance for doubtful accounts was inadequate for years prior to and including 2003; and

- a liability related to repayment obligations of approximately $22 million due in 2015 or later with respect to membership contracts sold by a subsidiary before Bally acquired it in the late 1980s had not been reflected in the Company's financial statements since 1995.

The Audit Committee determined that previously reported financial statements and other reported financial statements and other information should no longer be relied upon and announced so publicly on November 15, 2004. The Audit Committee completed its investigation on February 8, 2005 and reported its results to the SEC. the Company continues to cooperate in the SEC investigation, which is ongoing as of the date of this filing.

(November 30, 2005 Form 10-K, p. 5.)

58.     In the same Form 10-K Bally said the following:

As a result of the above events and circumstances, we have undertaken a comprehensive review of our previously filed consolidated financial statements since the year 2000. The review was a longer process than expected due to (i) the discovery of numerous additional accounting

errors after the inception of the review; (ii) cumbersome legacy data systems; (iii) the hiring of a new financial team, including a new Chief Financial Officer, Controller, Assistant Controller and Treasurer; and (iv) the multiple-year audits by the Company's new independent auditors, KPMG. In addition, during the review and pursuant to management's evaluation of internal controls pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"), we identified material weaknesses in our internal controls. See Item 9A – Controls and Procedures.

In the course of reviewing our historical accounting and financial reporting:

- we evaluated a substantial number of accounting entries;

- we assessed the potential impact in previously-issued financial statements of historical accounting practices that were not in accordance with generally accepted accounting principles in the United States ("GAAP");

- we identified material weaknesses in our internal controls and began remediating those material weaknesses;

- we identified shortfalls in information technology infrastructure and financial systems capabilities and began implementing several enhancements to those systems; and

- we identified and implemented new accounting policies, including policies relating to revenue recognition, long-lived assets and goodwill and intangible assets, among others.

In November 2005, we completed the comprehensive review of our accounting records and previously issued financial statements for periods from January 1, 2000 to December 31, 2003. KPMG has completed its audit of our restated 2002 and 2003 consolidated financial statements as well as our 2004 consolidated financial statements and its report accompanies this Annual Report.

(November 30, 2005 Form 10-K, pp. 5-6.)

59. In the same Form 10-K Bally said the following:

In February 2005, the Company announced that its Audit Committee had completed its investigation into various accounting issues and had identified a number of deficiencies that, either individually or in the aggregate, indicated material weaknesses in its internal control over financial reporting. Management, with the oversight of the Audit

Committee, has been addressing all of these issues and is committed to effectively and expeditiously remediating known material weaknesses. However, the focus of our attention has been on the completion of the various investigations and on issuing financial statements and therefore we have not yet fully remediated certain of our known material weaknesses. We are in the process of establishing a timeline for remediating those remaining weaknesses. The Audit Committee's investigation also found multiple accounting errors in the Company's financial statements and concluded that four former executives, including the Company's former Chief Executive Officer and former Chief Financial Officer, engaged in improper conduct. As a result, the Company announced that it will make no further payments to its former CEO and former CFO under their severance arrangements and that it terminated its Controller and Treasurer. Although the scope of the Audit Committee's investigation did not specifically examine the performance of former auditors E&Y, Bally believes that E&Y made several errors in the course of their work. The Company is continuing to evaluate its legal options with respect to E&Y. The Company announced that following its disclosure of the results of its Audit Committee investigation, the United States Department of Justice initiated a criminal investigation with which the Company is fully cooperating. Bally also received and is evaluating demands from two stockholders requesting that the Company initiate litigation against certain of its current and former officers and directors and other stockholders have initiated such litigation purportedly on the Company's behalf. For further discussion of the investigation of and legal proceedings relating to certain revenue recognition methods, See Restatement, Item 3 -- Legal Proceedings and Item 9A -- Controls and Procedures.

(November 30, 2005 Form 10-K, p. 22.)

60.     In the same Form 10-K Bally said the following:

Effective December 11, 2002, Lee Hillman resigned as Chairman and Chief Executive Officer.  Effective April 28, 2004, John Dwyer resigned as Executive Vice President, Chief Financial Officer and Director. In connection with the resignations of Mr. Hillman and Mr. Dwyer, each of them entered into a severance agreement with the company. Mr. Hillman's agreement provided that he would receive certain benefits through December 31, 2005. Mr. Dwyer's agreement provided that he would be able to consult with the Company through December 31, 2005. On February 8, 2005, the Company announced that its Audit Committee investigation found multiple accounting errors in the Company's financial statements and concluded that both Mr. Hillman, as former Chief Executive Officer and Director, and Mr. Dwyer, as the former Chief Financial Officer, were primarily responsible. In addition, the investigation found, among other things, that certain accounting

policies and positions were suggested and implemented without a reasonable empirical basis and concluded that Mr. Dwyer made a false and misleading statement to the SEC. As a result of these findings, the Company decided to make no further payments to either Mr. Hillman or Mr. Dwyer under each of the respective severance agreements.

(November 30, 2005 Form 10-K, p. 70.)

61.    With the November 30, 2005 Form 10-K, Bally included the report of Bally's independent public accounting firm, KPMG. In its report, KPMG identified nine material weaknesses, as of December 31, 2004, in Bally's internal controls, as follows: (1) deficiencies in Bally's control environment; (2) deficiencies in end-user computing controls; (3) inadequate controls associated with accounting for revenue; (4) inadequate controls associated with accounting for fixed assets; (5) inadequate controls associated with accounting for goodwill and other intangible assets; (6) inadequate controls associated with accounting for leases; (7) inadequate controls associated with accounting for accrued liabilities; (8) inadequate controls associated with accounting for computer software; and (9) inadequate financial statement preparation and review procedures. (November 30, 2005 Form 10-K, pp. 59-64.)

## COUNT I

## RESCISSION

### (215 ILCS 5/154)

62.    GAIC repeats and reallege each and every allegation contained in paragraph 1-61 above as though set forth fully herein.

63.    As of the date that Bally submitted each of the Proposal Forms to GAIC in connection with its application for the Policies, Bally's financial statements, incorporated into and made a part of those Proposal Forms, contained misrepresentations or false

warranties by Bally and Cross-Defendants that materially affected the acceptance of the risk or the hazard assumed by GAIC.

64.     In underwriting its respective Policies, GAIC relied upon these material misrepresentations or false warranties in the Proposal Forms.

65.     GAIC did not know that the information included with the Proposal Forms, including the financial statements included therewith, was false, nor can it be charged with such knowledge.

66.     Had GAIC known that Bally's financial statements, incorporated into the Proposal Forms for the respective Policies, contained misrepresentations or false warranties regarding Bally's financial condition, it would not have underwritten and issued the Policies. Pursuant to 215 ILCS 5/154, the Policies are therefore void *ab initio* and should be treated as if they were never in force or effect, providing no coverage whatsoever.

67.     GAIC has tendered or will tender to Bally the return of all premiums charged for the Policies.   Alternatively, such premium can be set off against the $10,000,000 that GAIC paid to Bally in connection with the 02/03 Policy and those sums that GAIC has paid or will pay  to Bally in connection with the 01/02 Policy, pursuant to the Interim Funding and Non-Waiver Agreement.

**WHEREFORE**, GAIC respectfully requests that this Court enter judgment:

A.     declaring that the Policies are rescinded, void *ab initio* and of no force or effect whatsoever as to both Bally and Cross-Defendants;

B.   declaring that no coverage exists for any of the Bally Matters, or any other matter, for which Bally and/or Cross-Defendants have sought coverage under the Policies;

C.   Awarding GAIC the full, $10,000,000 it paid Bally in connection with the 02/03 Policy and all amounts that GAIC has paid or will pay Bally or any Cross-Defendant in connection with the 01/02 Policy, pursuant to the Interim Funding and Non-Waiver Agreement; and

D.   awarding such other and further relief as this court deems just and proper.

**A JURY TRIAL IS DEMANDED AS TO ALL ISSUES SO TRIABLE.**

Dated: January 24, 2008

/s/ Robert B. Baker
Leonard S. Surdyk
Robert B. Baker
**SURDYK & BAKER**
225 West Washington Street, Suite 2200
Chicago, Illinois 60606
Telephone: (312) 924-2818
Facsimile: (312) 924-2867
lsurdyk@sbchicago-law.com
rbaker@sbchicago-law.com

**Attorneys for Plaintiff, Counter-Defendant and Cross-Plaintiff, Great American Insurance Company**

### CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing CROSS-CLAIM FOR RESCISSION OF PLAINTIFF, COUNTER-DEFENDANT AND CROSS-PLAINTIFF GREAT AMERICAN INSURANCE COMPANY was served upon all counsel of record, via electronic mail, on the 24th day of January, 2008.

/s/ Robert B. Baker